# CAMPBELL *v.* LOUISIANA

No. 96–1584.   Argued January 20, 1998—Decided April 21, 1998

KENNEDY, J., delivered the opinion for a unanimous Court with respect to Parts I, II, IV, and V, and the opinion of the Court with respect to Part III, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, SOUTER, GINSBURG, and BREYER, JJ., joined. THOMAS, J., filed an opinion concurring in part and dissenting in part, in which SCALIA, J., joined, *post*, p. 403.

*Dmitrc I. Burnes* argued the cause for petitioner. With him on the briefs was *Richard·V. Burnes.*

*Richard P. Ieyoub,* Attorney General of Louisiana, argued the cause for respondent. With him on the brief were *Kathleen E. Petersen* and *Mary Ellen Hunley,* Assistant Attorneys General, and *Paul R. Baier.**

JUSTICE KENNEDY delivered the opinion of the Court.

We must decide whether a white criminal defendant has standing to object to discrimination against black persons in the selection of grand jurors. Finding he has the requisite standing to raise equal protection and due process claims, we reverse and remand.

I

A grand jury in Evangeline Parish, Louisiana, indicted petitioner Terry Campbell on one count of second-degree

---

**Joshua L. Dratel, Lisa Kemler,* and *Richard A. Greenberg* filed a brief for the National Association of Criminal Defense Lawyers as *amicus curiae* urging reversal.

murder.   Campbell, who is white, filed a timely pretrial motion to quash the indictment on the grounds the grand jury was constituted in violation of his equal protection and due process rights under the Fourteenth Amendment and in violation of the Sixth Amendment's fair-cross-section requirement.   Campbell alleged a longstanding practice of racial discrimination in the selection of grand jury forepersons in the parish.   His sole piece of evidence is that, between January 1976 and August 1993, no black person served as a grand jury foreperson in the parish, even though more than 20 percent of the registered voters were black persons.   See Brief for Petitioner 16.   The State does not dispute this evidence. The trial judge refused to quash the indictment because "Campbell, being a white man accused of killing another white man," lacked standing to complain "where all of the forepersons were white."   App. to Pet. for Cert. G–33.

After Campbell's first trial resulted in a mistrial, he was retried, convicted of second-degree murder, and sentenced to life in prison without possibility of parole.   Campbell renewed his challenge to the grand jury foreperson selection procedures in a motion for new trial, which was denied.   See *id.*, at I–2.   The Louisiana Court of Appeal reversed, because, under our decision in *Powers* v. *Ohio*, 499 U. S. 400 (1991), Campbell had standing to object to the alleged discrimination even though he is white.   651 So. 2d 412 (1995). The Court of Appeal remanded the case for an evidentiary hearing because it found Campbell's evidence of discrimination inadequate.   *Id.*, at 413.

The Louisiana Supreme Court reversed.   It distinguished *Powers* as turning on the "considerable and substantial impact" that a prosecutor's discriminatory use of peremptory challenges has on a defendant's trial as well as on the integrity of the judicial system.   See 661 So. 2d 1321, 1324 (1995). The court declined to extend *Powers* to a claim of discrimination in the selection of a grand jury foreperson.   It also found *Hobby* v. *United States*, 468 U. S. 339 (1984), did not

afford Campbell standing to raise a due process objection. In *Hobby,* this Court held no relief could be granted to a white defendant even if his due process rights were violated by discrimination in the selection of a federal grand jury foreperson. Noting that *Hobby* turned on the ministerial nature of the federal grand jury foreperson's duties, the Louisiana Supreme Court held "[t]he role of the grand jury foreman in Louisiana appears to be similarly ministerial" such that any discrimination "has little, if any, effect on the defendant's due process right of fundamental fairness." 661 So. 2d, at 1324. Because the Court of Appeal had not addressed Campbell's other asserted points of error, the Louisiana Supreme Court remanded the case. After the Court of Appeal rejected Campbell's remaining claims, 673 So. 2d 1061 (1996), the Louisiana Supreme Court refused to reconsider its ruling on the grand jury issue, 685 So. 2d 140 (1997). We granted certiorari to address the narrow question of Campbell's standing to raise equal protection, due process, and fair-cross-section claims. 521 U. S. 1151 (1997).

## II

As an initial matter, we note Campbell complains about more than discrimination in the selection of his grand jury foreperson; he alleges that discrimination shaped the composition of the grand jury itself. In the federal system and in most States which use grand juries, the foreperson is selected from the ranks of the already seated grand jurors. See 1 S. Beale, W. Bryson, J. Felman, & M. Elston, Grand Jury Law and Practice § 4:6, pp. 4–20 to 4–21 (2d ed. 1997) (either the judge selects the foreperson or fellow grand jurors elect him or her). Under those systems, the title "foreperson" is bestowed on one of the existing grand jurors without any change in the grand jury's composition. In Louisiana, by contrast, the judge selects the foreperson from the grand jury venire before the remaining members of the grand jury have been chosen by lot. La. Code Crim. Proc.

Ann., Art. 413(B) (West Supp. 1997); see also 1 Beale, *supra*, at 4–22, n. 11 (Ohio, Oklahoma, Tennessee, and Virginia use procedures similar to Louisiana's). In addition to his other duties, the foreperson of the Louisiana grand jury has the same full voting powers as other grand jury members. As a result, when the Louisiana judge selected the foreperson, he also selected one member of the grand jury outside of the drawing system used to compose the balance of that body. These considerations require us to treat the case as one alleging discriminatory selection of grand jurors.

### III

Standing to litigate often turns on imprecise distinctions and requires difficult line-drawing. On occasion, however, we can ascertain standing with relative ease by applying rules established in prior cases. See *Allen* v. *Wright,* 468 U. S. 737, 751 (1984). Campbell's equal protection claim is such an instance.

In *Powers* v. *Ohio, supra,* we found a white defendant had standing to challenge racial discrimination against black persons in the use of peremptory challenges. We determined the defendant himself could raise the equal protection rights of the excluded jurors. Recognizing our general reluctance to permit a litigant to assert the rights of a third party, we found three preconditions had been satisfied: (1) the defendant suffered an "injury in fact"; (2) he had a "close relationship" to the excluded jurors; and (3) there was some hindrance to the excluded jurors asserting their own rights. *Powers, supra,* at 411 (citing *Singleton* v. *Wulff,* 428 U. S. 106 (1976)). We concluded a white defendant suffers a serious injury in fact because discrimination at the *voir dire* stage "'casts doubt on the integrity of the judicial process' . . . and places the fairness of a criminal proceeding in doubt." 499 U. S., at 411. This cloud of doubt deprives the defendant of the certainty that a verdict in his case "is given in accordance with the law by persons who are fair." *Id.,* at 413.

Second, the excluded juror and criminal defendant have a close relationship: They share a common interest in eliminating discrimination, and the criminal defendant has an incentive to serve as an effective advocate because a victory may result in overturning his conviction. *Id.*, at 413–414. Third, given the economic burdens of litigation and the small financial reward available, "a juror dismissed because of race probably will leave the courtroom possessing little incentive to set in motion the arduous process needed to vindicate his own rights." *Id.*, at 415. Upon consideration of these factors, we concluded a white defendant had standing to bring an equal protection challenge to racial discrimination against black persons in the petit jury selection process.

Although Campbell challenges discriminatory selection of grand jurors, rather than petit jurors, *Powers*' reasoning applies to this case on the question of standing. Our prior cases have not decided whether a white defendant's own equal protection rights are violated when the composition of his grand jury is tainted by discrimination against black persons. We do not need to address this issue because Campbell seeks to assert the well-established equal protection rights of black persons not to be excluded from grand jury service on the basis of their race. See Tr. 9 (Dec. 2, 1993); see also *Carter* v. *Jury Comm'n of Greene Cty.*, 396 U. S. 320, 329–330 (1970) (racial exclusion of prospective grand and petit jurors violates their constitutional rights). Campbell satisfies the three preconditions for third-party standing outlined in *Powers*.

Regardless of his or her skin color, the accused suffers a significant injury in fact when the composition of the grand jury is tainted by racial discrimination. "[D]iscrimination on the basis of race in the selection of members of a grand jury . . . strikes at the fundamental values of our judicial system" because the grand jury is a central component of the criminal justice process. *Rose* v. *Mitchell*, 443 U. S. 545, 556 (1979). The Fifth Amendment requires the Federal Gov-

ernment to use a grand jury to initiate a prosecution, and 22 States adopt a similar rule as a matter of state law. See 1 Beale, *supra*, § 1:2, at 1–3; see also *Hurtado* v. *California*, 110 U. S. 516 (1884) (Fifth Amendment's grand jury requirement is not binding on the States). The grand jury, like the petit jury, "acts as a vital check against the wrongful exercise of power by the State and its prosecutors." *Powers*, *supra*, at 411. It controls not only the initial decision to indict, but also significant decisions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision to charge a capital crime. See *Vasquez* v. *Hillery*, 474 U. S. 254, 263 (1986). The integrity of these decisions depends on the integrity of the process used to select the grand jurors. If that process is infected with racial discrimination, doubt is cast over the fairness of all subsequent decisions. See *Rose*, *supra*, at 555–556 ("Selection of members of a grand jury because they are of one race and not another destroys the appearance of justice and thereby casts doubt on the integrity of the judicial process").

*Powers* emphasized the harm inflicted when a prosecutor discriminates by striking racial minorities in open court and in front of the entire jury pool. The Court expressed concern that this tactic might encourage the jury to be lawless in its own actions. See 499 U. S., at 412–413. The State suggests this sort of harm is not inflicted when a single grand juror is selected based on racial prejudice because the discrimination is invisible to the grand jurors on that panel; it only becomes apparent when a pattern emerges over the course of years. See Brief for Respondent 16. This argument, however, underestimates the seriousness of the allegations. In *Powers*, even if the prosecutor had been motivated by racial prejudice, those responsible for the defendant's fate, the judge and the jury, had shown no actual bias. If, by contrast, the allegations here are true, the impartiality and discretion of the judge himself would be called into question.

The remaining two preconditions to establish third-party standing are satisfied with little trouble. We find no reason why a white defendant would be any less effective as an advocate for excluded grand jurors than for excluded petit jurors. See *Powers, supra,* at 413–414. The defendant and the excluded grand juror share a common interest in eradicating discrimination from the grand jury selection process, and the defendant has a vital interest in asserting the excluded juror's rights because his conviction may be overturned as a result. See *Vasquez, supra,* at 264; *Rose, supra,* at 551; *Cassell* v. *Texas,* 339 U. S. 282 (1950). The State contends Campbell's connection to "the excluded class of . . . jurors . . . who were not called to serve . . . for the prior 16½ years is tenuous, at best." Brief for Respondent 22. This argument confuses Campbell's underlying claim with the evidence needed to prove it. To assert the rights of those venirepersons who were excluded from serving on the grand jury in *his* case, Campbell must prove *their exclusion* was on account of intentional discrimination. He seeks to do so based on past treatment of similarly situated venirepersons in other cases, see *Castaneda* v. *Partida,* 430 U. S. 482, 494 (1977), but this does not mean he seeks to assert those venirepersons' rights. As a final matter, excluded grand jurors have the same economic disincentives to assert their own rights as do excluded petit jurors. See *Powers, supra,* at 415. We find Campbell, like any other white defendant, has standing to raise an equal protection challenge to discrimination against black persons in the selection of his grand jury.

## IV

It is axiomatic that one has standing to litigate his or her own due process rights. We need not explore the nature and extent of a defendant's due process rights when he alleges discriminatory selection of grand jurors, and confine our holding to his standing to raise the issue. Our decision in *Peters* v. *Kiff* addressed the due process question, al-

though a majority of Justices could not agree on a comprehensive statement of the rule or an appropriate remedy for any violation. See 407 U. S. 493, 504 (1972) (opinion of Marshall, J.) ("[W]hatever his race, a criminal defendant has standing to challenge the system used to select his grand . . . jury, on the ground that it arbitrarily excludes . . . members of any race, and thereby denies him due process of law"); *id.,* at 507 (White, J., joined by Brennan and Powell, JJ., concurring in judgment) ("[T]he strong statutory policy of [18 U. S. C.] § 243, which reflects the central concern of the Fourteenth Amendment" permits a white defendant to challenge discrimination in grand jury selection). Our more recent decision in *Hobby* v. *United States* proceeded on the implied assumption that a white defendant had standing to raise a due process objection to discriminatory appointment of a federal grand jury foreperson and skipped ahead to the question whether a remedy was available. 468 U. S., at 350. It is unnecessary here to discuss the nature and full extent of due process protection in the context of grand jury selection. That issue, to the extent it is still open based upon our earlier precedents, should be determined on the merits, assuming a court finds it necessary to reach the point in light of the concomitant equal protection claim. The relevant assumption of *Hobby,* and our holding here, is that a defendant has standing to litigate whether his conviction was procured by means or procedures which contravene due process.

The Louisiana Supreme Court erred in reading *Hobby* to foreclose Campbell's standing to bring a due process challenge. 661 So. 2d, at 1324. In *Hobby,* we held discrimination in the selection of a federal grand jury foreperson did not infringe principles of fundamental fairness because the foreperson's duties were "ministerial." See *Hobby, supra,* at 345–346. In this case, the Louisiana Supreme Court decided a Louisiana grand jury foreperson's duties were ministerial too, but then couched its decision in terms of Camp-

bell's lack of standing to litigate a due process claim. 661 So. 2d, at 1324.

The Louisiana Supreme Court was wrong on both counts. Its interpretation of *Hobby* is inconsistent with the implicit assumption of standing we have just noted and with our explicit reasoning in that case. In *Hobby*, a federal grand jury foreperson was selected from the existing grand jurors, so the decision to pick one grand juror over another, at least arguably, affected the defendant only if the foreperson was given some significant duties that he would not have had as a regular grand juror. See *supra*, at 396. Against this background, the Court rejected the defendant's claim because the ministerial role of a federal grand jury foreperson "is not such a vital one that discrimination in the appointment of an individual to that post significantly invades" due process. *Hobby, supra*, at 346. Campbell's challenge is different in kind and degree because it implicates the impermissible appointment of a member of the grand jury. See *supra*, at 396–397. What concerns Campbell is not the foreperson's performance of his duty to preside, but performance as a grand juror, namely, voting to charge Campbell with second-degree murder.

The significance of this distinction was acknowledged by *Hobby*'s discussion of a previous case, *Rose* v. *Mitchell*, 443 U. S. 545 (1979). In *Rose*, we assumed relief could be granted for a constitutional challenge to discrimination in the appointment of a state grand jury foreperson. See *id.*, at 556. *Hobby* distinguished *Rose* in part because it involved Tennessee's grand jury system. Under the Tennessee law then in effect, 12 members of the grand jury were selected at random, and then the judge appointed a 13th member who also served as foreperson. See *Hobby*, 468 U. S., at 347. As a result, *Hobby* pointed out discrimination in selection of the foreperson in Tennessee was much more serious than in the federal system because the former can affect the composition of the grand jury whereas the latter cannot: "So

long as the grand jury itself is properly constituted, there is no risk that the appointment of any one of its members as foreman will distort the overall composition of the array or otherwise taint the operation of the judicial process." *Id.*, at 348. By its own terms, then, *Hobby* does not address a claim like Campbell's.

## V

One of the questions raised on certiorari is whether Campbell also has standing to raise a fair-cross-section claim. It appears neither the Louisiana Supreme Court nor the Louisiana Court of Appeal discussed this contention. "With 'very rare exceptions,' . . . we will not consider a petitioner's federal claim unless it was either addressed by or properly presented to the state court that rendered the decision we have been asked to review." *Adams* v. *Robertson*, 520 U. S. 83, 86 (1997) *(per curiam)*. Campbell has made no effort to meet his burden of showing this issue was properly presented to the Louisiana appellate courts, even after the State pointed out this omission before this Court. See Brief for Respondent 29–30. In fact, Campbell devotes no more than one page of text in his brief to his fair-cross-section claim. See Brief for Petitioner 31–32. We decline to address the issue.

The judgment of the Louisiana Supreme Court is reversed. The case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE THOMAS, with whom JUSTICE SCALIA joins, concurring in part and dissenting in part.

I fail to understand how the rights of blacks excluded from jury service can be vindicated by letting a white murderer go free. Yet, in *Powers* v. *Ohio*, 499 U. S. 400 (1991), the Court held that a white criminal defendant had standing to challenge his criminal conviction based upon alleged violations of the equal protection rights of black prospective ju-

rors. Today's decision, rather than merely reaffirming *Powers'* misguided doctrine of third-party standing, applies that doctrine to a context in which even *Powers'* rationales are inapplicable. Because *Powers* is both incorrect as an initial matter and inapposite to the case at hand, I respectfully dissent from Part III of the Court's opinion. I join Parts I, II, IV, and V and concur in the judgment reversing and remanding to the Louisiana Supreme Court.

*Powers* broke new ground by holding for the first time that a criminal defendant may raise an equal protection challenge to the use of peremptory strikes to exclude jurors of a different race. See *id.*, at 422 (SCALIA, J., dissenting) (explaining that *Powers* was inconsistent with "a vast body of clear statement" in our precedents). Recognizing that the defendant could not claim that his own equal protection rights had been denied, the Court held that the defendant had standing to assert the equal protection rights of veniremen excluded from the jury. *Id.*, at 410–416. The Court concluded that the defendant had such "third party standing" because three criteria had been met: he had suffered an "injury in fact"; he had a "close relation" to the excluded jurors; and there was "some hindrance" to the jurors' ability to protect their own interests. *Id.*, at 410–411.

*Powers* distorted standing principles and equal protection law and should be overruled.[1] As JUSTICE SCALIA explained at length in his dissent, the defendant in *Powers*

---

[1] As I have explained elsewhere, the entire line of cases following *Batson* v. *Kentucky*, 476 U. S. 79 (1986) (holding that the Equal Protection Clause applies to the use of peremptory strikes), including *Powers*, is a misguided effort to remedy a general societal wrong by using the Constitution to regulate the traditionally discretionary exercise of peremptory challenges. The *Batson* doctrine, rather than helping to ensure the fairness of criminal trials, serves only to undercut that fairness by emphasizing the rights of excluded jurors at the expense of the traditional protections accorded criminal defendants of all races. See *Georgia* v. *McCollum*, 505 U. S. 42, 60–62 (1992) (THOMAS, J., concurring in judgment).

could not satisfy even the first element of standing—injury in fact. *Id.*, at 426–429. The defendant, though certainly displeased with his conviction, failed to demonstrate that the alleged discriminatory use of peremptory challenges against veniremen of another race had any effect on the outcome of his trial. The Court instead found that the defendant had suffered a "cognizable" injury because racial discrimination in jury selection "'casts doubt on the integrity of the judicial process'" and "invites cynicism respecting the jury's neutrality and its obligation to adhere to the law." *Id.*, at 411–412. But the severity of an alleged wrong and a perception of unfairness do not constitute injury in fact. Indeed, "'[i]njury in perception' would seem to be the very *antithesis* of 'injury in fact.'" *Id.*, at 427 (SCALIA, J., dissenting). Furthermore, there is no reason why a violation of a third party's right to serve on a jury should be grounds for reversal when other violations of third-party rights, such as obtaining evidence against the defendant in violation of another person's Fourth or Fifth Amendment rights, are not. *Id.*, at 429 (SCALIA, J., dissenting).

*Powers* further rested on an alleged "close relation[ship]" that arises between a defendant and veniremen because *voir dire* permits them "to establish a relation, if not a bond of trust," that continues throughout the trial. *Id.*, at 411, 413. According to the Court, excluded veniremen share the accused's interest in eliminating racial discrimination because a peremptory strike inflicts upon a venireman a "profound personal humiliation heightened by its public character." *Id.*, at 413–414. But there was simply no basis for the Court's finding of a "close relation[ship]" or "common interest," *id.*, at 413, between black veniremen and white defendants. Regardless of whether black veniremen wish to serve on a particular jury, they do not share the white defendant's interest in obtaining a reversal of his conviction. Surely a black venireman would be dismayed to learn that a white

defendant used the venireman's constitutional rights as a means to overturn the defendant's conviction.[2]

Finally, *Powers* concluded that there are substantial obstacles to suit by excluded veniremen, including the costs of proceeding individually and the difficulty of establishing a likelihood of recurrence. *Id.,* at 414–415. These obstacles, though perhaps often present in the context of *Batson* v. *Kentucky,* 476 U. S. 79 (1986), are alone insufficient to justify third-party standing.

Even if the *Powers* justifications were persuasive, they would still be wholly inapplicable to this case, which involves neither peremptory strikes nor discrimination in the selection of the petit jury. The "injury in fact" allegedly present in *Powers* is wholly absent from the context at hand. *Powers* reasoned that repeated peremptory strikes of members of one race constituted an "overt wrong, often apparent to the entire jury panel," that threatened to "cas[t] doubt over the obligation of the parties, the jury, and indeed the court to adhere to the law throughout the trial of the cause." *Powers,* 499 U. S., at 412. Here, in contrast, the judge selected one member of the grand jury venire to serve as foreman, and the remaining members of the grand jury were selected at random. Even if discriminatory, the judge's selection (rather than exclusion) of a single member of the grand jury could hardly constitute an "overt" wrong that would affect the remainder of the grand jury proceedings, much less the subsequent trial. The Court therefore resorts to emphasizing the seriousness of the allegation of racial discrimination (as though repetition conveys some talismanic power), but that, of course, cannot substitute for injury in fact.

In this case, unlike *Powers*, petitioner's allegation of injury in fact is not merely unsupported; it is directly foreclosed. There is no allegation in this case that the composition of

---

[2] Of course, the same sense of dismay would arise if the defendant and the excluded venireman were of the same race.

petitioner's *trial* jury was affected by discrimination. Instead, the allegation is merely that there was discrimination in the selection of the grand jury (and of only one member). The properly constituted petit jury's verdict of guilt beyond a reasonable doubt was in no way affected by the composition of the grand jury. Indeed, to the extent that race played any part in the composition of petitioner's petit jury, it was by petitioner's own actions, as petitioner used 5 of his 12 peremptory strikes to eliminate blacks from the petit jury venire. Petitioner's attempt to assert that he was injured by the alleged exclusion of blacks at the grand jury stage is belied by his own use of peremptory strikes against blacks at the petit jury stage.

It would be to no avail to suggest that the alleged discrimination in grand jury selection could have caused an indictment improperly to be rendered, because the petit jury's verdict conclusively establishes that no reasonable grand jury could have failed to indict petitioner.[3] Nor can the Court find support in our precedents allowing a defendant to challenge his conviction based upon discrimination in grand jury selection, because all of those cases involved defendants' assertions of *their own* rights. See, *e. g., Rose* v. *Mitchell,* 443 U. S. 545 (1979); *Cassell* v. *Texas,* 339 U. S. 282 (1950). Although we often do not require a criminal defendant to establish a cause-and-effect relationship between the procedural illegality and the subsequent conviction when the defendant asserts a denial of his own rights, see 499 U. S., at 427–428 (SCALIA, J., dissenting) (noting that the government generally bears the burden of establishing harmlessness of such errors), even the *Powers* majority acknowledged that

---

[3] For this reason, it is unlikely that petitioner ultimately will prevail on the merits of his due process claim. However, I agree with the Court's conclusion that petitioner has standing to raise that claim because petitioner asserts *his own* due process right. I join Part IV of the Court's opinion because it addresses only standing and does not address "the nature and extent" of petitioner's due process right. *Ante,* at 400.

such a showing is the foremost requirement of third-party standing, as evidenced by the lengths to which it went in an attempt to justify its finding of injury in fact.

The Court's finding of a close relationship (an ambient fraternity of sorts) between petitioner and the black veniremen whose rights he seeks to vindicate is likewise unsupported. The Court, of course, never identifies precisely whose rights petitioner seeks to vindicate. Is it all veniremen who were not chosen as foreman? Is it all nonwhite veniremen? All black veniremen? Or just the black veniremen who were not ultimately chosen for the grand jury? Leaving aside the fact that the Court fails to identify the rights-holders, I fail to see how a "close relationship" could have developed between petitioner and the veniremen. Even if a "bond," *Powers* v. *Ohio, supra,* at 413, could develop between veniremen and defendants during *voir dire,* such a bond could not develop in the context of a judge's selection of a grand jury foreman—a context in which the defendant plays no role. Nor can any "common interest" between a defendant and excluded veniremen arise based upon a public humiliation suffered by the latter, because unlike the exercise of peremptory strikes, Evangeline Parish's process of selecting foremen does not constitute "overt" action against particular veniremen. Rather, those veniremen not chosen (all but one) are simply left to take their chances at being randomly selected for the remaining seats on the grand jury.

Finally, there are ample opportunities for prospective jurors whose equal protection rights have been violated to vindicate those rights, rather than relying upon a defendant of another race to do so for them. In contrast to the *Batson* line of cases, where an allegation may concern discrimination in the defendant's case alone, in this case petitioner alleges systematic discrimination in the selection of grand jury foremen in Evangeline Parish. Such systematic discrimination provides a large class of potential plaintiffs and the opportu-

nity for declaratory or injunctive relief to prevent repeated violations.

For these reasons, I would hold that petitioner—who does not claim that he was discriminated against or that the alleged discrimination against others had any effect on the outcome of his trial—lacks standing to raise the equal protection rights of excluded black veniremen. Accordingly, I join Parts I, II, IV, and V of the Court's opinion and concur in the judgment.