**Frederick A. LAKE, Petitioner,**

v.

**Janet RENO, Attorney General of the United States, Respondent.**

**Docket No. 99–4125.**

United States Court of Appeals, Second Circuit.

Argued: March 31, 2000

Decided: Sept. 12, 2000

John D.B. Lewis, New York, NY, Jonathan S. Franklin, Lorane F. Hérbert, Hogan & Hartson, Washington, D.C., Claudia Slovinsky, New York, NY, Lucas Guttentag, Immigrants' Rights Project, New York, NY, Sara L. Mandelbaum, American Civil Liberties Union, New York, NY, for Petitioner.

Diogenes P. Kekatos, Assistant United States Attorney, Mary Jo White, United States Attorney, Southern District of New York, Gideon A. Schor, Assistant United States Attorney, New York, NY, for Respondent.

Anthony M. Radice, Deborah H. Isser, Mark David McPherson, Morrison & Foerster, New York, NY, Jonathan Band, Morrison & Foerster, Washington, D.C., Martha F. Davis, NOW Legal Defense and Education Fund, New York, NY, for Amicus Curiae NOW Legal Defense and Education Fund.

Before: OAKES, WALKER, and KEITH,* Circuit Judges.

### [CORRECTED OPINION]

JOHN M. WALKER, JR., Circuit Judge:

Petitioner Frederick A. Lake appeals from an order of the Board of Immigration Appeals ("BIA"), affirming the decision by the Immigration Judge ("IJ") that denied Lake's request for termination of removal proceedings and ordered his removal. Lake, who was born abroad and out of wedlock to an American father and an alien mother, claimed United States citi-

* The Hon. Damon J. Keith, of the Sixth Circuit Court of Appeals, sitting by designation.

zenship from birth under section 301(7) of the Immigration and Nationality Act (the "INA"), 8 U.S.C. § 1401(7) (1952), on the basis that his father was a United States citizen at the time of Lake's birth, and had met the residency requirements of the statute. Under section 309(a) of the INA, 8 U.S.C. § 1409(a) (1952), in order to confer citizenship upon an illegitimate child born abroad, a citizen father must establish his child's paternity by legitimation before the child reaches the age of 21. This requirement is not imposed upon citizen mothers. Lake, on behalf of his father, challenged section 309(a) as violative of the equal protection component of the Fifth Amendment's Due Process Clause because it burdened United States citizen fathers but not United States citizen mothers in establishing American citizenship for their foreign-born offspring. The BIA held that it lacked jurisdiction to consider this claim. We hold, first, that Lake has standing to raise his father's equal protection challenge, and, second, that section 309(a), as it applies to Lake's father, violates the constitutional requirement of equal protection of the laws. We therefore reverse the judgment of the BIA.

## BACKGROUND

Lake was born in Jamaica in 1953 to Joseph Lake, a United States citizen, and Edith White, a Jamaican citizen. Although his parents never married, Lake's father had intermittent contact with him as a child, referred to Lake as his son to his other children, and listed him as one of his children in the family Bible. When Lake was 33 years old, in 1987, Lake moved to the United States as a lawful permanent resident married to a United States citizen. In 1991, he was convicted of armed robbery in New York state court, and sentenced to a minimum of six years' imprisonment. Lake was released on parole in 1997, the same year his father died.

In April 1998, the Immigration and Naturalization Service ("INS") began removal proceedings against Lake under 8 U.S.C. § 1227(a)(2)(A)(iii) (1999), as an alien convicted of an aggravated felony under 8 U.S.C. § 1101(a)(43)(F) (1999). At a hearing before the IJ, Lake denied that he was a deportable alien, claiming United States citizenship through his father. The government did not dispute that Joseph Lake was a United States citizen or that he was Lake's father. The IJ determined that, while there were indications that Lake's father had acknowledged paternity as to Lake, Lake's father had failed to do so in writing under oath as required by INA section 309(a). Thus, the IJ concluded that Lake was subject to removal because he had failed to show that his father had met the statutory requirement of establishing Lake's paternity by legitimation. The IJ also rejected Lake's equal protection challenge. On appeal, the BIA found that, assuming that Lake had established paternity, he had no claim to citizenship because he had not satisfied the conditions of section 309(a). The BIA rejected, as beyond its jurisdiction, Lake's two constitutional challenges: the unequal treatment of illegitimate children claiming citizenship through their fathers, and the unavailability of a waiver provision for lawful permanent residents under section 212(h) of the INA.

## DISCUSSION

On appeal, Lake renews his argument that section 309(a) of the INA violates the constitutional guarantee of equal protection. In the alternative, Lake argues that if his citizenship claim is rejected, he should be granted relief on the basis that the application of section 212(h) of the INA, 8 U.S.C. § 1182(h) (1999), denies equal protection to lawful permanent residents. Because we reverse on the first ground, we do not need to consider the second.

Section 309 of the INA, which we will examine in some detail momentarily, provides that, subject only to a one-year continuous residency requirement applicable to the citizen mother, conferral of citizen-

ship by a citizen mother is automatic at birth. *See* 8 U.S.C. § 1409(c) (1952). However, conferral of citizenship by a citizen father occurs only if the father takes the affirmative step of establishing paternity by legitimation before his child's 21st birthday. *See id.* § 1409(a). Thus, if Lake's mother had been the citizen instead of his father, Lake would automatically be a United States citizen and not subject to deportation. Because this is so, Lake argues, the statute establishes a facially discriminatory classification based on gender that cannot withstand heightened scrutiny under *United States v. Virginia*, 518 U.S. 515, 532–34, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996).

In opposition, the government asserts that (1) Lake has no standing to raise the equal protection rights of his father; (2) even if Lake has standing, section 309(a) passes constitutional muster: (a) easily under the deference to Congress accorded to immigration statutes under *Fiallo v. Bell*, 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977), or (b) even under the heightened standard applicable to gender discrimination cases in the non-immigration context; and (3) regardless of the constitutionality of section 309(a), no remedy is available because only Congress and not the courts can confer citizenship. We examine each of these contentions in turn.

Like the proverbial 800–pound gorilla, a Supreme Court decision sits squarely in the middle of this case. In *Miller v. Albright*, 523 U.S. 420, 118 S.Ct. 1428, 140 L.Ed.2d 575 (1998), the Supreme Court faced a nearly identical challenge to the current version of section 309. The Court fragmented, with the justices writing five separate opinions. Six justices accepted arguments of the government, but not the same arguments. Three justices held section 309 to be unconstitutional and two more said they would agree with those

three, but that the plaintiff did not have standing to make the relevant constitutional challenge under the circumstances of that case. The precise arguments advanced by the parties here were made in *Miller*. On the facts of *Miller*, the Court did not hold section 309 unconstitutional; however, after analyzing and parsing the opinions of the justices in *Miller* as the law of our circuit suggests we should, we are convinced that the Court would have reached a different result had this case been before it. But before we dissect *Miller*, we turn to the relevant statutory provisions.

*The Relevant Statutory Provisions*

The parties agree that the version of the INA that applies to Lake is the one that was in effect in 1953, the year of his birth. *See Runnett v. Shultz*, 901 F.2d 782, 783 (9th Cir.1990) ("The applicable law for transmitting citizenship to a child born abroad when one parent is a U.S. citizen is the statute that was in effect at the time of the child's birth."). For equal protection purposes, the earlier and current versions of the statute are indistinguishable, because both place greater burdens on the citizen father than on the citizen mother. Section 301 sets forth which persons shall be nationals and citizens of the United States at birth. Such persons include:

> a person born outside the geographical limits of the United States and its outlying possessions of parents one of whom is an alien, and the other a citizen of the United States who, prior to the birth of such person, was physically present in the United States or its outlying possessions for a period or periods totaling not less than ten years, at least five of which were after attaining the age of fourteen years.

8 U.S.C § 1401(a)(7) (1952).[1]

The statutory provision that is attacked in this case, section 309(a), applies specifi-

---

1. The statute was amended effective 1986. *See* Pub.L. No. 99–653, § 12, 100 Stat. 3655, 3657 (Nov. 14, 1986). The current version of section 301 tracks essentially the same language, but imposes a shorter residency requirement, whereby the citizen parent must have been "physically present in the United States or its outlying possessions for a period

cally to children who are born out of wed-lock to citizen fathers and non-citizen mothers. Enacted in 1952, it states in relevant part:

> The provisions of paragraphs (3)-(5) and (7) of section 1401(a) of this title ... shall apply as of the date of birth to a child born out of wedlock on or after the effective date of this chapter, if the paternity of such child is established while such child is under the age of twenty-one years by legitimation.

8 U.S.C. § 1409(a) (1952).[2] In contrast, section 309(c), which applies to citizen mothers whose children are born abroad to non-citizen fathers, provides that:

> a person born ... outside the United States and out of wedlock shall be held to have acquired at birth the nationality status of his mother, if the mother had the nationality of the United States at the time of such person's birth, and if the mother had previously been physically present in the United States or one of its outlying possessions for a continuous period of one year.

8 U.S.C. § 1409(c) (1952).[3] It is the disparity of the requirements for recognizing citizenship at birth between sections 309(a) and 309(c) that is at the heart of this appeal.[4]

*Miller v. Albright*

Although no conclusive majority reasoning resulted from the judgment in *Miller*, the case's various opinions provide a valuable guide to the resolution of this case. "It is unfortunate that we must rely on nose-count jurisprudence but, in the absence of an authoritative majority opinion from the Supreme Court, we must seek our guidance from the available expressions of the various views of its members." *In re Application of the Herald Co.*, 734 F.2d 93, 98 n. 3 (2d Cir.1984); *see also TranSouth Fin. Corp. v. Bell*, 149 F.3d 1292, 1296–97 (11th Cir.1998) (noting that plurality opinions of the Supreme Court are not binding); *Jacobsen v. United States Postal Serv.*, 993 F.2d 649, 654–55 (9th Cir.1993) (analyzing the various opinions of the Supreme Court in a plurality decision).

In *Miller*, the daughter born abroad of an American citizen father and an alien mother who were not married brought an equal protection challenge to the current version of section 309(a). Initially, Miller's father, who was alive at all times throughout the litigation, had been added to her complaint as co-plaintiff to assert his own rights, but his claim was dismissed by the district court. *See Miller v. Christopher*, 870 F.Supp. 1, 2 (D.D.C.1994) (giving procedural history). Therefore, the daughter alone sought to assert before the Supreme

---

or periods totaling not less than five years, at least two of which were after attaining the age of fourteen years" prior to the birth of their child. 8 U.S.C. 1401(g) (1999).

**2.** The current version of section 309(a) provides that:

> The provisions of paragraphs (c), (d), (e), and (g) of section 1401 of this title ... shall apply as of the date of birth to a person born out of wedlock if–
> (1) a blood relationship between the person and the father is established by clear and convincing evidence,
> (2) the father had the nationality of the United States at the time of the person's birth,
> (3) the father (unless deceased) has agreed in writing to provide financial support for

the person until the person reaches the age of 18 years, and
> (4) while the person is under the age of 18 years–
>> (A) the person is legitimated under the law of the person's residence or domicile,
>> (B) the father acknowledges paternity of the person in writing under oath, or
>> (C) the paternity of the person is established by adjudication of a competent court.
> 8 U.S.C. § 1409(a) (1999).

**3.** The current version of section 309(c) is in all material respects identical. *See* 8 U.S.C. § 1409(c) (1999).

**4.** Unless otherwise indicated, all subsequent citations to 8 U.S.C. will refer to the Immigration and Naturalization Act of 1952.

Court a violation of her father's equal protection rights.

Justice Stevens, writing for the Court in an opinion joined by the Chief Justice, found that the petitioner had standing to raise the equal protection rights of her father, a United States citizen, *see Miller,* 523 U.S. at 432–33, 118 S.Ct. 1428, and thus that heightened scrutiny might apply to the statute, *see id.* at 434 n. 11, 118 S.Ct. 1428. Justice Stevens then determined that heightened scrutiny was satisfied, and thus upheld the statute, because the different requirements imposed on citizen fathers were well tailored to support important government interests, which he identified as (1) preventing spurious claims of citizenship, (2) ensuring reliable proof of paternity, (3) guaranteeing that the citizen father is actually aware of the child's existence, and (4) fostering ties between the child and its father and between the child and the United States. *See id.* at 435–38, 118 S.Ct. 1428. Justice O'Connor concurred in the judgment, but for quite different reasons. She wrote a separate opinion, joined by Justice Kennedy, explaining that she did not believe the petitioner had standing to raise her father's constitutional rights because she had "not demonstrated a substantial hindrance to her father's ability to assert his own rights." *Id.* at 447, 118 S.Ct. 1428 (O'Connor, J., concurring). As the statute did not classify the petitioner herself based on her gender, Justice O'Connor reviewed the statute under rational basis scrutiny and found that the government easily met this lower burden of justification. *See id.* at 451–52, 118 S.Ct. 1428 (O'Connor, J., concurring). She made clear, however, that she did not believe that the statute would pass muster if the petitioner had standing to assert her father's claim: "I do not share Justice Stevens' assessment that the provision withstands heightened scrutiny. . . . It is unlikely, in my opinion, that any gender classifications based on stereotypes can survive heightened scrutiny." *Id.* (O'Connor, J., concurring). Justice Scalia also concurred in the judgment, in an opinion joined by Justice Thomas, for yet another reason. He would assume petitioner's standing, but still not reach the merits of the equal protection claim because he did not believe the Court had the "power to provide the relief requested: conferral of citizenship on a basis other than that prescribed by Congress." *Id.* at 453, 118 S.Ct. 1428 (Scalia, J., concurring). Justice Breyer, joined by Justices Ginsburg and Souter, dissented, finding that (1) petitioner had standing to raise her father's rights, (2) heightened scrutiny was the proper standard of review, and (3) the statutory requirements imposed on citizen fathers violated equal protection standards. *See id.* at 473, 481–82, 118 S.Ct. 1428 (Breyer, J., dissenting). Justice Ginsburg, joined by Justices Breyer and Souter, wrote a separate dissenting opinion, reviewing the history of the treatment of children born abroad to United States citizen parents, and agreeing with the conclusions of Justice Breyer. *See id.* at 460, 118 S.Ct. 1428 (Ginsburg, J., dissenting) ("As Justice Breyer convincingly demonstrates, 8 U.S.C. § 1409 classifies unconstitutionally on the basis of gender. . . .").

We now turn to the three questions that occupied the Court's attention in *Miller* as they pertain to this case: standing, the merits, and remedy.

*Standing*

 A litigant seeking to assert the rights of another person must satisfy three elements: (1) injury in fact, (2) a close relation with the third party, and (3) some hindrance to the third party's ability to protect his or her own interests. *See Campbell v. Louisiana,* 523 U.S. 392, 397, 118 S.Ct. 1419, 140 L.Ed.2d 551 (1998) (citing *Powers v. Ohio,* 499 U.S. 400, 411, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991)). While there is no dispute that Lake has satisfied the first two elements, the government argues that Lake has not satisfied the hindrance element because, although Joseph Lake is now unquestionably hindered from pressing his own claim because

he is dead, there is no showing that he was hindered during his lifetime from asserting a claim of citizenship on his son's behalf. The government cites no authority for the proposition that a litigant seeking third-party standing must affirmatively demonstrate that the deceased holder of a right desired during his or her lifetime to vindicate that right and was hindered in doing so. We decline to read such a requirement into the law. We observe only that in *Miller*, seven of the nine justices did not appear to have any difficulty with petitioner's standing in that case, where the citizen father was still alive but had been dismissed from the suit. And the two that found no standing believed that, if the petitioner's father had been deceased, there would have been standing, precisely the situation here.

As discussed above, the plurality opinion of the Court, as well as the dissent, explicitly found that Miller had standing to press her father's equal protection claim. *See Miller*, 523 U.S. at 433, 118 S.Ct. 1428; *id.* at 473, 118 S.Ct. 1428 (Breyer, J., dissenting). The concurrence by Justice Scalia, joined by Justice Thomas, assumed she had standing. *See id.* 455 n. 1, 118 S.Ct. 1428 (Scalia, J., concurring) ("I accept petitioner's third-party standing"). Justice O'Connor's concurrence alone found that Miller, the daughter of a living United States citizen, lacked standing. *See id.* at 447, 118 S.Ct. 1428 (O'Connor, J., concurring). But while Justice O'Connor noted that "[a] hindrance signals that the right-holder did not simply decline to bring the claim on his own behalf, but could not in fact do so," *id.* at 450, 118 S.Ct. 1428 (O'Connor, J., concurring), she concluded that death was "an extreme example" of the kind of "daunting barriers deterr[ing] the rightholder" that permit third-party standing, *id.* at 449, 118 S.Ct. 1428 (O'Connor, J., concurring) (citing *Hodel v. Irving*, 481 U.S. 704, 711–12, 107 S.Ct. 2076, 95 L.Ed.2d 668 (1987)) (internal quotation marks omitted). Therefore, it is plain that the Court, and likely a unanimous Court, would have found standing if Miller's fa-

ther had not been alive and therefore would find standing in this case.

Joseph Lake died before the INS commenced removal proceedings against his son. At the time that the necessity for Lake's constitutional challenge became apparent, Joseph Lake was irrevocably and finally hindered from vindicating his own rights, and we will not speculate as to his earlier intentions. We therefore hold that Lake possesses third-party standing to assert his father's equal protection claim. *Accord United States v. Ahumada–Aguilar*, 189 F.3d 1121, 1122–23, 1126 (9th Cir. 1999) (finding petitioner had standing where citizen father was dead, even though · father had no contact with his son his whole life and may not even have known of his existence).

*Equal Protection*

 Having determined that Lake has standing to assert the rights of his father, we find the merits of this case to be dictated by *Miller*. It is clear to us that had the petitioner in *Miller* had standing to press the claims of her citizen father, five justices of the Court—the three dissenters plus Justices O'Connor and Kennedy—would have held section 309(a) unconstitutional on equal protection grounds. As dissenter Justice Breyer observed, "[L]ike Justice O'Connor, I 'do not share,' and thus I believe a Court majority does not share, 'Justice Stevens' assessment that the provision withstands heightened scrutiny.'" *Miller*, 523 U.S. at 476, 118 S.Ct. 1428 (Breyer, J., dissenting). *See id.* at 452, 118 S.Ct. 1428 (O'Connor, J., concurring) ("It is unlikely, in my opinion, that any gender classifications based on stereotypes can survive heightened scrutiny . . . .").

The government contends that heightened scrutiny does not apply to section 309(a) because, like other immigration statutes, it was enacted pursuant to Congress' plenary authority over immigration and naturalization, *see* U.S. Const. art. I, § 8 ("The Congress shall have Power . . .

[t]o establish a uniform Rule of Naturalization . . . ."), and that the correct standard to apply is the highly deferential one of *Fiallo v. Bell*, 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977). Under *Fiallo*, Congress may enact a discriminatory rule regarding immigration or naturalization so long as it has a "facially legitimate and bona fide reason" for doing so. *Id.* at 794, 97 S.Ct. 1473 (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 770, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972)).

The same argument was made by the government to the Court in *Miller*, with no discernable success. The plurality declined to reach the issue. *See Miller*, 523 U.S. at 429, 118 S.Ct. 1428 ("[W]e need not decide whether *Fiallo v. Bell* dictates the outcome of this case, because [*Fiallo* ] involved the claims of several aliens to a special immigration preference, whereas here the petitioner claims that she is, and for years has been, an American citizen."). Neither of the concurrences mentioned *Fiallo,* while the dissent expressly rejected application of that standard. *See id.* at 478, 118 S.Ct. 1428 (Breyer, J., dissenting) (arguing that the more lenient standard of review of *Fiallo* does not apply to a petitioner claiming to have been a citizen from birth).

*Fiallo* itself made clear that the reduced threshold of justification for governmental action that applied to immigrants did not apply to citizens. The *Fiallo* Court had before it a section of the INA that granted a preferred immigration status to those who qualified as "children" or "parents" of United States citizens or lawful permanent residents. The statute was challenged by several unwed natural fathers and their out-of-wedlock children, who did not qualify for preferred status under the terms of the statute. The Court concluded that the "decision not to accord preferential status to this particular class of aliens" was one solely for Congress, *Fiallo*, 430 U.S. at 799, 97 S.Ct. 1473, but pointed out that "in the exercise of its broad power over immigration and naturalization, Congress regu-

larly makes rules that would be unacceptable if applied to citizens," *id.* at 792, 97 S.Ct. 1473 (internal quotation marks omitted). As a United States citizen, Joseph Lake's claim of equal protection, which his son has standing to raise here, is not governed by the standards applied to equal protection claims of aliens, and we have found no case holding otherwise. *See Breyer v. Meissner*, 214 F.3d 416, 424 (3d Cir.2000) ("Because [the statute] created a gender classification with respect to Breyer's mother's ability to pass her citizenship to her foreign-born child at his birth, the section is subject to heightened scrutiny. Thus, this action is distinguishable from cases in which courts have considered the equal protection rights of naturalized persons themselves and found heightened scrutiny inapplicable.").

In *Miller,* the two justices in plurality and the three justices in dissent found that heightened scrutiny was the appropriate standard. They would have been joined in that conclusion by Justices O'Connor and Kennedy had they believed that the standing hurdle had been overcome. As seven justices in *Miller* would have applied heightened scrutiny in these circumstances, and five of the justices would have found the government's justification for the statute insufficient to satisfy that standard, as discussed above, we hold that section 309(a) violates the equal protection rights of citizen fathers as guaranteed by the Fifth Amendment.

### 5. *Remedy*

We discuss one more issue in the interest of completeness. The government's final argument is that, even if the court finds section 309(a) to be unconstitutional, Lake can be accorded no relief because the court has no authority to grant citizenship. The government rests this claim on *INS v. Pangilinan*, 486 U.S. 875, 108 S.Ct. 2210, 100 L.Ed.2d 882 (1988), which held that a court could not naturalize aliens who had not timely filed naturalization petitions. We find that case to be

inapposite. In *Pangilinan*, aliens who had served honorably in the United States armed forces, but were no longer statutorily eligible to be naturalized, petitioned for naturalization as an equitable remedy. *See id.* at 882–83, 108 S.Ct. 2210. The Supreme Court held that "the power to make someone a citizen of the United States has not been conferred upon the federal courts, like mandamus or injunction, as one of their generally applicable equitable powers." *Id.* at 883–84, 108 S.Ct. 2210.

While it is axiomatic that courts do not have the power to confer "citizenship on a basis other than that prescribed by Congress," *Miller* at 453, 118 S.Ct. 1428 (Scalia, J., concurring), Lake is not an alien who seeks naturalization as an equitable remedy. The INA plainly defines naturalization as "the conferring of nationality of a state upon a person after birth, by any means whatsoever." 8 U.S.C. § 1101(23) (1952). It is Lake's claim that Congress conferred citizenship upon him at birth, and he merely asks the court to recognize his status, not to confer citizenship. Therefore, he contends, the provisions of the INA relating to naturalization do not apply to him. We agree.

Congress provides for a blanket grant of citizenship at birth to children born abroad of one United States citizen parent under INA section 301(a)(7), subject only to the citizen parent's cumulative presence requirement of ten years prior to the child's birth, at least five of which must be after the parent turns 14. *See* 8 U.S.C. § 1401(a)(7) (1952). That provision is not challenged here. On top of this straightforward grant, Congress has overlaid the requirements of section 309, applicable specifically to children born abroad out of wedlock. If section 309(a) is unconstitutional, under the separability provision of the INA, it may be severed, leaving the remainder of the INA intact. *See* Immigration and Naturalization Act of 1952, Pub.L. No. 414, § 406, 66 Stat. 281 ("If any particular provision of this Act, or the

application thereof to any person or circumstance, is held invalid, the remainder of the Act ... shall not be affected thereby."). Therefore, in accordance with section 406's plain meaning, the unconstitutional section 309(a) may be severed, and the remainder of the INA, including section 301(a)(7), applied to Lake. We note that with section 309(a) severed, under section 309(c), citizen mothers would remain subject to a one-year continuous residency requirement from which citizen fathers would be exempt. This problem could be resolved in one of two ways: either by applying the one-year continuous residency requirement to both mothers and fathers, or by removing it entirely. No choice between the two is required in this case, however, because it is undisputed that Lake's father has met the one-year continuous residency requirement.

To summarize our conclusion, in the absence of section 309(a), Lake's status as a citizen at birth is incontrovertible. As "a person born outside the geographical limits of the United States and its outlying possessions of parents one of whom is an alien, and the other a citizen of the United States," Lake's status is governed by section 301(a)(7), 8 U.S.C. § 1401(a)(7) (1952). Under section 301(a)(7), so long as his father, prior to Lake's birth, "was physically present in the United States ... for a period or periods totaling not less than ten years, at least five of which were after attaining the age of fourteen years," *id.*, Lake is within the class of persons who "shall be nationals and citizens of the United States at birth," *id.* § 1401(a). As there is no genuine issue of material fact as to Lake's paternity or Joseph Lake's residence in the United States, we simply recognize that, pursuant to congressional enactment, Lake has been a United States citizen since birth.

Nothing in *Miller* compels a different conclusion. Apart from the concurrence of Justice Scalia, joined by Justice Thomas, which agreed with the government's position here that Miller could be granted no

**150**

relief, *see Miller*, 523 U.S. at 456, 459, 118 S.Ct. 1428 (Scalia, J., concurring), there is no indication in *Miller* that the other Justices would hold that view. Because it found no constitutional violation, the plurality opinion expressed no opinion on the subject of remedy, *see id.* at 445 n. 26, 118 S.Ct. 1428, while noting in its discussion on standing that if the petitioner were to prevail, "the judgment in her favor would confirm her pre-existing citizenship rather than grant her rights that she does not now possess," *id.* at 432, 118 S.Ct. 1428. Justice O'Connor's concurrence noted "potential problems with fashioning a remedy," *id.* at 451, 118 S.Ct. 1428 (O'Connor, J., concurring), without further elaboration, while the dissenting justices found that there was no intrusion upon Congressional power, *see id.* at 489, 118 S.Ct. 1428 (Breyer, J., dissenting) ("[T]he Court need not grant citizenship. The statute itself grants citizenship automatically, and 'at birth.' And this Court need only declare that that is so."). We therefore believe that there is no impediment to our simple recognition of Congress's grant of citizenship.

## CONCLUSION

Interpreting Supreme Court precedent as authorized by our own precedent, we find that the gender-based distinction mandated by section 309(a) of the INA violates the right to equal protection secured by the Due Process Clause of the Fifth Amendment. We therefore conclude that petitioner Lake holds United States citizenship from birth under section 301(a)(7). The decision of the BIA is reversed.